**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **RAYMOND STINDE,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **vs.** | **)** | **Case No. 3:19-CV-01140-MAB** |
| | **)** | |
| **JOSHUA SCHOENBECK, *et al.*,** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

Presently before the Court is Plaintiff Raymond Stinde's motion for summary judgment as to liability (Doc. 70) and Defendants Marivon T. Ampier, Frank Lawrence, and Joshua Schoenbeck's motion, and supporting memorandum, for summary judgment (Docs. 72, 73), as well as the parties' responsive briefs (Docs. 77, 78). For the reasons set forth below, Plaintiff's motion for summary judgment is DENIED. Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

**PROCEDURAL BACKGROUND**

Plaintiff filed this *pro se* civil rights action pursuant to 42 U.S.C. §1983 on October 21, 2019 (Doc. 1; 15), alleging Eighth and Fourteenth Amendment constitutional violations against prison officials related to disciplinary action taken after he was issued a disciplinary report on July 11, 2019 while at Pinckneyville Correctional Center ("Pinckneyville") for an alleged assault (*Id.*). Following a threshold review pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on an Eighth Amendment claim

alleging deliberate indifference to a serious medical need against Defendants Schoenbeck, Ampier, and Lawrence for imposing disciplinary sanctions on Plaintiff without contacting mental health (Doc. 15, pp. 2, 7).

Plaintiff filed a motion for recruitment of counsel on August 10, 2020, which was granted by the Court on October 16, 2020 (Docs. 41, 47). After engaging in discovery, Plaintiff filed his motion for summary judgment as to liability on October 29, 2021 (Doc. 70). The same day, Defendants filed their motion, and supporting memorandum, for summary judgment (Docs. 72, 73). Both Plaintiff and Defendants filed their respective responses to the cross motions for summary judgment on December 13, 2021 (Docs. 77, 78).

## FACTUAL BACKGROUND[1]

Plaintiff entered IDOC custody in April 2009 (Doc. 73-1, p. 8). He was housed at Pinckneyville from 2017 through July 11, 2019 and then he was transferred to Menard Correctional Center (Doc. 73-1, p. 25). Defendant Schoenbeck is a Correctional Officer with the rank of Lieutenant at Menard (Doc. 73-6, pp. 7-8). Defendant Lawrence has been the Warden of Menard since February 1, 2019 (Doc. 73-4). As Warden, Lawrence supervises all department heads and the daily operations at Menard. *Id.* Defendant Ampier is a correctional officer at Menard and was part of the Adjustment Committee until 2019 (Doc. 70-3, p. 4).

[1] The following factual background is taken from the parties' briefs. The parties do not directly respond to one another's asserted facts, so the Court has included the factual allegations that were supported by the record as a whole.

**A. The Adjustment Committee Hearing Process**

The Adjustment Committee at Menard reviews disciplinary reports regarding prisoner issues and then makes a decision whether or not they believe the inmate is guilty or not guilty and then recommends potential discipline (Doc. 73-6, p. 9). Schoenbeck served on the Adjustment Committee at Menard for three years as the Chairperson of that Committee (Doc. 73-6, p. 9).

In general when an inmate commits is accused of committing a disciplinary infraction, a disciplinary report is prepared, which is then given to a shift commander, and ultimately served on the inmate (Doc. 73-6, p. 11). The hearings are held in the common areas of the cell house; the typical process is that the Chairperson (Schoenbeck) reads the disciplinary report out loud to the inmate, asks whether they are guilty or not guilty, and then offers the inmate a chance to tell his side of the story (Doc. 73-6, p. 11). The inmate can request witnesses at that time, but the witnesses are not called in front of the inmate at the hearing (Doc. 73-6, p. 11.). After the inmate has provided his side of the story, the Adjustment Committee (which consists of the Chairperson and a hearing investigator) will make a decision whether to follow up with witnesses or make a recommendation on the infraction and then submit it to the warden (Doc. 73-6, p. 12-13).

In order to prepare for a hearing, the Adjustment Committee is given the factual disciplinary reports, incident reports, prior disciplinary history, and a mental health report if the inmate whose disciplinary report is being heard is identified as seriously mentally ill "SMI" (Doc. 73-6, p. 15). Ms. Sandy Walker, who is a correctional officer and hearing investigator on the Adjustment Committee at Menard also testified about

Adjustment Committee and the process (Doc. 73-3). Specifically, she indicated that if a prisoner is diagnosed as SMI and is appearing before the Adjustment Committee, the Committee gets an SMI report from a mental health professional ("MHP") prior to the hearing (Doc. 73-3, p. 10). The method of alerting the Adjustment Committee to an SMI diagnosis is to put "SMI" at the top of the ticket (Doc. 73-3, p. 15). The Adjustment Committee will consult with the MHP prior to the hearing to obtain a recommendation (Doc. 73-3, p. 17).[2] Ms. Walker testified that when she receives a report from a MHP, she attaches the report to the ticket so that the Adjustment Committee has it at the hearing (Doc. 73-3, p. 19). As for Plaintiff and the disciplinary ticket at issue, it indicated Plaintiff was SMI, but the record is unclear as to who identified or designated Plaintiff as SMI.

**B. <u>Plaintiff's Disciplinary Ticket + Disciplinary Hearing</u>**

The disciplinary ticket at issue was written on July 11, 2019 and relates to an incident in which Plaintiff threw urine on a correctional officer through the bars of his cell (Doc. 77-4, p. 2). At the top of the disciplinary ticket, "SMI" is written (Doc. 77-4, p. 2).[3] The next day, on July 12, 2019, Plaintiff received a copy of the disciplinary ticket and

---

[2] IDOC Policy mandates specific procedures for when a SMI inmate receives a disciplinary report for an offense that could include segregation. The Policy requires that a MHP review the prisoner's records and ticket, and then complete a Mental Health Disciplinary Review on a specific form, which will include (among other things) the "MHP's opinion on the overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs" (Doc. 77-1, p. 4). The Policy outlines that "[i]f the MHP recommended, based on clinical indications, that no segregation time be served or that a specific treatment during segregation is necessary, the committee *shall adopt those recommendations*" (Doc. 77-1, p. 5) (emphasis added).

[3] The assault outlined in the ticket occurred while Plaintiff was at Pinckneyville, but soon after, Plaintiff was transferred to Menard and appeared before the Adjustment Committee (Doc. 77-4, p. 2; Doc. 73-1, pp. 25-27).

written on the top of that ticket was "SMI" (Doc. 73-1, p. 25-26).[4]

On July 16, 2019, Plaintiff attended a disciplinary hearing before the Adjustment Committee, which consisted of Schoenbeck and Ampier for this July 11 ticket (Doc. 77-2, p. 3; 77-3, p. 4). Schoenbeck acknowledged that he understands the Adjustment Committee and Hearing Investigator should consider a prisoner's SMI designation when imposing disciplinary action (Doc. 73-6, p. 19, 26-28). Ampier testified that she has seen SMI written on the top of a disciplinary report before and, in her experience, the Lieutenant would have reviewed the file to determine if there were documents to support that notation on the ticket (Doc. 70-3, p. 9). Sergeant Royster, who escorts prisoners to Adjustment Committee hearings, also confirmed that this was the standard practice for alerting the Adjust Committee of an SMI designation – writing it on top of the disciplinary ticket (Doc. 70-5, p. 4).

Schoenbeck explained in his deposition that the Adjustment Committee's Final Report Summary for Plaintiff's July 11 infraction does not make any mention of his SMI diagnosis or a MHP's recommendation (Doc. 73-6, p. 34). And he indicated he does not recall if a MHP provided a report in connection with the process (Doc. 73-6, p. 35). Schoenbeck also testified that the Adjustment Committee takes a MHP's recommendation into consideration, but does not have to follow it (Doc. 73-6, p. 43-44). Schoenbeck does not recall contacting mental health about Plaintiff prior to the Adjustment Committee meeting, but he testified that he would have checked the SMI list

---

[4] Plaintiff indicated he thought Sandy Walker wrote SMI on the top of this ticket (Doc. 73-1, pp. 26-27). Schoenbeck, however, testified that does not know who labeled Plaintiff as SMI (Doc. 73-6, p. 45).

to see if Plaintiff was on it and, if so, would have contacted mental health (Doc. 73-6, p. 49).

Ampier testified similarly. She indicated that although she did not remember Plaintiff specifically, if the Committee had considered SMI status prior to imposing discipline, it would be reflected in the Final Report (Doc. 70-3, p. 15). And since the Final Report doe not include any information beyond the "SMI" designation at the top, Ampier testified that the SMI designation would not have been considered in recommending discipline (Doc. 70-3, p. 15).[5] Ultimately, Plaintiff was placed in segregation for three months following the Adjustment Committee hearing at issue (Doc. 77-8).

**C. Plaintiff's Mental Health History**

Ms. Carrie Morris is employed by the IDOC as a "Social Worker 4," and was temporarily assigned as a "Psyche Admin," at Menard (Doc. 73-2, p. 8). Her deposition took place on August 13, 2021, and she testified that at the time of her deposition, she had seen Plaintiff twice a month since December 2020 for individual sessions (Doc. 73-2, p. 6). When Ms. Morris first began therapy sessions with Plaintiff, she reviewed his medical file, which included his previous psychiatric care (Doc. 73-2, pp. 26-27). In December 2020, Plaintiff was diagnosed with "unspecified depressive disorder" and "antisocial personality disorder" (Doc. 73-2, p. 27). Ms. Morris later testified that plaintiff also had a diagnosis of SMI starting in November 2020 because of a major depressive disorder

[5] Defendants, in their response to Plaintiff's statement of facts, acknowledge that a prisoner's SMI status must be considered before placement in segregation and that SMI prisoners are vulnerable in segregation (Doc. 78, p. 2).

episode with psychotic features (Doc. 73-2, p. 30).

A prisoner can be considered SMI if they are diagnosed as such by a MHP or if they are placed on crisis watch (Doc. 73-2, pp. 9-10). Crisis is when a prisoner has a significant amount of distress or if they feel like self-harming or harming someone else (Doc. 73-2, p. 10). Ms. Morris further testified that if a prisoner is experiencing grief, they may be put on crisis and therefore given an SMI diagnosis for the duration of that crisis (Doc. 73-2, p. 10). To be taken off crisis, the prisoner has to be "clinically stable" and deny thoughts of suicide or homicide (Doc. 73-2, p. 11). When a prisoner comes off crisis, a medical professional also removes the SMI diagnosis (Doc. 73-2, p. 11). Whereas if a prisoner has the SMI diagnosis because of a psychiatric disorder, he would have that designation until he was reevaluated by a psychiatrist who did not believe the inmate met the criteria for SMI (Doc. 73-2, p. 11). The decision to remove a prisoner's designation as SMI can also be made by a multidisciplinary team (Doc. 73-2, p. 11).

Ms. Morris testified that Plaintiff was put on crisis from July 2-July 4 (Doc. 73-2, p. 24). During this time he was designated as SMI and according to Ms. Morris that designation should have been removed once crisis ended (Doc. 73-2, p. 24-28). Ms. Morris testified that Plaintiff's psychiatric diagnoses while at Pinckneyville did not designate him as SMI (Doc. 73-2, p. 24). Ms. Morris indicated that at the time of the July 11, 2019 Adjustment Committee's Final Report, Plaintiff should not have been designated as SMI because she saw "a discharge from crisis" on July 4, 2019 (Doc. 73-2, pp. 31-32).

However, it is also important to note that while Plaintiff was still at Pinckneyville on July 3, 2019, he was involved in a disciplinary issue. He had a hearing before the

Adjustment Committee on July 11, 2019 (the same day he committed the infraction that lead to the disciplinary report in this case). At this hearing, Plaintiff pled "not guilty," stating, "I don't know what I did, the devil had control" (Doc. 77-9, p. 2). The Adjustment Committee noted in the report that Plaintiff "is designated a SMI. Mental Health was contacted who recommended no segregation. The Adjustment Committee is recommending segregation due to [the] violent nature of the assault" (Doc. 77-9, p. 2).[6] Ultimately, Plaintiff was given, among other punishments 2 months of segregation despite an MHP's recommendation for no segregation (Doc. 77-9, p. 2). In the "Final Comments" section of this report, the committee wrote, "Offender will be eligible for a segregation reduction based upon mental health recommendations, participation in mental health programming and compliance with facility rules" (Doc. 77-9, p. 3). So, it appears, that the Pinkneyville Adjustment Committee believed Plaintiff was SMI as of July 11, 2019 and operated under the assumption.

## LEGAL STANDARD

Cross motions for summary judgment are treated separately under the standards applicable to each. *See McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008). Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED.

[6] Indeed, there is no indication in this document that the designation of Plaintiff as SMI was temporary (*i.e.* from July 2-4 while on crisis). The designation of Plaintiff as "SMI" uses the present tense, not the past tense.

R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party, who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 332–24 (1986).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue exists "when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

This same standard applies when the parties file cross motions for summary judgment. *See Advance Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 746 (7th Cir. 2015). The court "take[s] the motions one at a time and then, as usual, construe[s] all facts and draw[s] all reasonable inferences in favor of the non-moving party." *Id.* The court can only grant summary judgment for one of the sides if the evidence as a whole—from both motions—establishes that no material facts are in dispute and the movant is entitled to judgment as a matter of law. *Id.*; *Bloodworth v. Vill. of Greendale*, 475 Fed.Appx. 92, 95 (7th Cir. 2012); *Davis v. Time Warner Cable of Se. Wisconsin, L.P.*, 651 F.3d 664, 671 (7th Cir. 2011).

## DISCUSSION

The Eighth Amendment's proscription against cruel and unusual punishment imposes an obligation on states "to provide adequate medical care to incarcerated individuals." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012) (citing

*Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials violate this proscription when they act with deliberate indifference to the serious medical needs of an inmate." *Holloway*, 700 F.3d at 1072 (citations omitted). To succeed on a claim for deliberate indifference, a plaintiff must demonstrate that they suffered from an "objectively serious medical condition" and that the defendant acted with a "sufficiently culpable state of mind, meaning the official he official knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Goodloe v. Sood*, 947 F.3d 1026, 1030–31 (7th Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994)).

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In other words, "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Whiting*, 839 F.3d at 662 (quoting *Farmer*, 511 U.S. at 837). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073 (citation omitted). It is "something akin to recklessness." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 50 (2019) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

## I. Defendants Lawrence, Schoenbeck, and Ampier's Motion for Summary Judgment

In their papers, Defendants argue that the undisputed facts show that Plaintiff does not suffer from an objectively serious medical condition, but if he did, that Plaintiff

cannot prove that Lawrence, Schoenbeck, and Ampier were deliberately indifferent; therefore, the Court should grant summary judgment. The Court begins by considering whether Defendants have established that Plaintiff does *not* have a serious medical condition.

**A. Serious Medical Condition**

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). It need not be life-threatening to be serious; it can be a condition that "significantly affects an individual's daily activities" or a condition that would result in further significant injury or chronic and substantial pain if left untreated. *Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008); *see also Gayton*, 593 F.3d at 620.

Defendants argue the evidence before the Court clearly establishes that Plaintiff was not diagnosed as SMI at the time alleged in his complaint; therefore, he does not suffer from an objectively serious condition (Doc. 73, p. 22). Defendants point to Ms. Morris's testimony, in which she outlined Plaintiff was "on crisis" July 2-July 4, 2019, during which he automatically was designated as SMI (Doc. 73-2, p. 24). Also during this time, Ms. Morris testified that Plaintiff had a diagnosis of unspecified depressive disorder, which according to the prison's internal healthcare systems, did not qualify Plaintiff as SMI (Doc. 73-2, p. 24).

Plaintiff argues that Defendants ignore "clear, undisputed evidence of [Plaintiff's] SMI status—the "SMI" designation on the top of his disciplinary ticket" (Doc. 77, p. 7).

Furthermore, Plaintiff points out that Defendants have not presented any evidence to question the legitimacy of the written SMI designation when Plaintiff appeared before the Adjustment Committee and they, presumably, saw this designation if they read the report, which Schoenbeck and Ampier testified they did (Doc. 77, p. 7). The parties agree that SMI constitutes an objectively serious condition, so the main dispute is whether Plaintiff was designated, or diagnosed, with SMI at the time of the Menard Adjustment Hearing.

Although Defendants say the SMI diagnosis on the top of the Adjustment Committee paperwork was an oversight, there is no evidence before the Court as to who wrote SMI on the top of the paperwork to indicate as much. All of the deposition testimony is inconclusive, with Defendants and witnesses alike stating they do not know who wrote SMI on Plaintiff's paperwork. Additionally, there are documents in the record that show Plaintiff was involved in another incident around July 3, 2019 (when he was on crisis watch). He had a hearing before the Adjustment Committee on July 11, 2019 (the same day he was issued a disciplinary ticket in this case). The Adjustment Committee noted that Plaintiff "is designated a SMI. Mental Health was contacted who recommended no segregation. The Adjustment Committee is recommending segregation due to [the] violent nature of the assault" (Doc. 77-9, p. 2). Indeed, Plaintiff is designated as "SMI" in the present tense, which would tend to suggest that the Adjustment Committee at Pinkneyville believed Plaintiff to be SMI on July 11, 2019. There is nothing in this documentary evidence to suggest Plaintiff's SMI diagnosis was temporary.

When viewing the evidence in the light most favorable to the Plaintiff, there is no

conclusive evidence that Plaintiff's SMI designation or diagnosis on his Menard Adjustment Committee paperwork was simply an error. The parties agree that the SMI designation constitutes a serious medical condition. And based on the current record, the Court cannot unequivocally say that no reasonable juror could find that Plaintiff did not suffer from an objectively serious medical condition. Indeed, if a juror credits Plaintiff's story (and or the documents from Pinkneyville on July 11, 2019), the first prong could very well be satisfied. Accordingly, the Court must consider the second prong of the deliberate indifference standard.

**B. Deliberate Indifference**

A prison official exhibits deliberate indifference when they know of a serious risk to the prisoner's health exists but consciously disregard that risk. *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citation omitted). "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016)). The deliberate indifference standard "requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073. It is "essentially a criminal recklessness standard, that is, ignoring a known risk." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citation omitted). *See also Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) ("Deliberate indifference requires a showing of more than mere or gross negligence, but less than the purposeful or knowing infliction of harm. We have characterized the required showing as something approaching a total unconcern for the

prisoner's welfare in the face of serious risks.") (citations and internal quotation marks omitted).

With respect to Defendant Lawrence, there is simply no evidence from which a juror could conclude he had the sufficiently culpable mental state. Indeed, the main piece of evidence in the record tying Defendant Lawrence to this case is that his signature appears on Plaintiff's Adjustment Committee Final Summary Report (Doc. 77-8). But Lawrence indicated that he has "no record of being personally made aware of Plaintiff's complaints regarding the disciplinary action" at issue or his SMI status (Doc. 73-4, p. 1). He stated that usually, one of his signatories reviews decisions and signs off on Adjustment Committee Final Summary Reports in his place (Doc. 73-4, p. 2). Lawrence also indicated that he reviewed the Adjustment Committee's Final Summary Report and averred that he "did not personally review or sign the Adjustment Committee Final Summary Report" or the relevant grievance (Doc. 73-4, p. 2).

Accordingly, there is no evidence Lawrence received or reviewed the Adjustment Committee findings or otherwise knew about Plaintiff's issue with the Adjustment Committee and/or his SMI designation or diagnosis. There is also no evidence to show Lawrence was in any way involved in the Adjustment Committee Hearing proceedings or approval after, as he did not sign off on Plaintiff's paperwork. *E.g., Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.") (citation and internal quotation marks omitted). And Lawrence cannot be held liable solely because he was in charge. *E.g., Lennon v. City of Carmel, Indiana*, 865 F.3d 503, 507–08 (7th Cir. 2017) ("[T]here is no

vicarious liability in a suit under section 1983."). Consequently, there is an absence of any evidence with respect to Lawrence regarding the subjective prong of the deliberate indifference standard and he is therefore entitled to summary judgment.

As for Schoenbeck and Ampier, there are disputed material facts regarding whether they were deliberately indifferent therefore, summary judgment is not appropriate. For example, Defendants argue that the "SMI" designation on Plaintiff's paperwork that the Adjustment Committee at Menard received was simply a mistake and Plaintiff was not diagnosed as SMI at that time, which means that Schoenbeck and Ampier did not have any obligation to contact Mental Health before issuing him segregation as a punishment (Doc. 73, p. 22).Plaintiff, however, argues the form still included "SMI" and there is no evidence in the record that questions the legitimacy of this designation at the time Plaintiff appeared before the Committee (Doc. 77, p. 7). Schoenbeck and Ampier's deposition testimony both acknowledged that if Plaintiff was SMI (as the designation indicated), they would have been obligated to consult an MHP on the overall appropriateness of placement in segregation. And both Defendants conceded the Final Report gives no indication that either one of them consulted an MHP or considered Plaintiff's SMI status. Accordingly, based on these facts, a jury must decide whether there is sufficient evidence to believe these Defendants had the sufficiently culpable state of mind. This is simply not an inference the Court can make one way or another at the summary judgment stage.

In sum, the differing stories between that of Shoenbeck and Ampier and Plaintiff would require the Court to choose sides and pick one factual scenario over the other if it

were to grant summary judgment. Therefore, summary judgment is not warranted for Schoenbeck and Ampier.

**C. Qualified Immunity**

Defendants also argue they are entitled to qualified immunity. In general, qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232. *See also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

When all inferences are drawn in Plaintiff's favor, Schoenbeck and Ampier's conduct could be said to demonstrate a violation of Plaintiff's constitutional rights. As previously noted, Plaintiff's claims against these two Defendants will survive summary judgment and therefore satisfies the first prong, requiring him to "establish that the actions of the defendant violated his constitutional rights." *Buck v. Hartman*, No. 12-CV-273-SMY-PMF, 2015 WL 393931, at *6 (S.D. Ill. Jan. 29, 2015) (citation omitted).

The second prong of the qualified immunity analysis requires that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). Both Schoenbeck and Ampier testified that they understand what to do when

confronted with a prisoner who is designated as SMI in an Adjustment Committee hearing (*see, e.g.*, Docs. 73-6; 70-3). As such, Defendants Schoenbeck and Ampier are not entitled to qualified immunity. *Est. of Clark v. Walker*, 865 F.3d 544 (7th Cir. 2017) (denying qualified immunity to jail staff who were deliberately indifferent to plaintiff's risk of suicide, holding that qualified immunity need not be litigated and established disease by disease).

## II. Plaintiff's Motion for Summary Judgment

The Court now turns to Plaintiff's motion for summary judgment. The Court is mindful that it must construe the facts now in the light most favorable to Defendants Schoenbeck and Ampier. The Court has determined that Defendant Lawrence is entitled to summary judgment and thus the Court declines to analyze Plaintiff's short arguments relating to Lawrence here.[7]

And in construing the facts in the light most favorable to Schoenbeck and Ampier, there are simply to many material factual disputes regarding the critical aspects of this case that prevents the Court from granting summary judgment. Indeed, granting summary judgment would require the Court to make credibility determinations, choose between competing inferences, and pick one factual scenario over another. *See supra* at pp. 10-15. The Court cannot do this at the summary judgment stage. The Court declines to recount its analysis and discussion again here regarding the many material disputes.

---

[7] Plaintiff noted in his response to Defendants' motion for summary judgment that he "is not asking that the Court grant him summary judgment against Defendant Lawrence" (Doc. 77, p. 2).

For the reasons outlined above (*see supra* at pp. 10-17), summary judgment is likewise inappropriate for the Plaintiff.

## CONCLUSION

For the aforementioned reasons, Plaintiff Raymond Stinde's motion for summary judgment as to liability is **DENIED** (Doc. 70). Defendants Marivon T. Ampier, Frank Lawrence, and Joshua Schoenbeck's motion for summary judgment (Doc. 72) is **GRANTED IN PART and DENIED IN PART**. It is **GRANTED** with respect to Defendant Lawrence. Defendant Lawrence is **DISMISSED with prejudice** and judgement will enter accordingly upon the conclusion of this case.

It is **DENIED** with respect to Defendants Ampier and Schoenbeck. The case will proceed against Defendants Ampier and Schoenbeck.

The Court will set this matter for a status conference by separate order to discuss the scheduling of a settlement conference and a trial setting.

**IT IS SO ORDERED.**

**DATED: September 27, 2022**

**/s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**